# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CRIMINAL ACTION |
| ) | NO. 10-00081 |
| TYRONE FIELDS, ) | |
| ) | |
| Defendant. ) | |

## MOTION TO SUPPRESS EVIDENCE
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**RUFE, J.**                                                                                                                            **December 14, 2010**

The United States charges Defendant Tyrone Fields, a/k/a "Omar Fields," a/k/a "Tyrone Johnson" ("Defendant") with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Defendant has filed a Motion to Suppress Physical Evidence Obtained in Violation of the Fourth Amendment [Doc. No. 18] and a Supplemental Motion to Suppress [Doc. No. 21], seeking the suppression of physical evidence obtained on March 22, 2009 in connection with an investigative stop of Defendant at 5663 Pentridge Street, and a subsequent incriminating statement made by Defendant on the same date.

Upon consideration of Defendant's Motion to Suppress Physical Evidence Obtained in Violation of the Fourth Amendment and the Supplemental Motion to Suppress, the Government's Response [Doc. No. 20], testimony presented at an evidentiary hearing and oral argument thereon, and in accordance with the Court's decision entered November 15, 2010 [Doc. No. 23], the Court now enters its findings of fact and conclusions of law.

FINDINGS OF FACT

1. On March 22, 2009, Philadelphia Police Officer Stephen Mitchell and his partner, Officer Eriberto "Eddie" DeJesus, were on patrol in the 12th Police District in a marked patrol unit, attired in full police uniform. Officer DeJesus was driving the vehicle and Officer Mitchell was in the passenger seat.[1]

2. At or between approximately 12:42 a.m. and 12:44 a.m., the Officers received a "priority one"—the highest priority—radio call from police dispatch with flash (descriptive) information about a residential break-in. The flash provided the location of the activity as 5663 Pentridge Street, and specified the perpetrator and incident: a black male wearing a light blue Pelle Pelle jacket attempting to kick in the front door of the residence with the female complainant inside.[2]

3. The 5663 Pentridge Street area is regarded as a high-crime location.[3]

4. The specified location is a corner house with a front porch, which has approximately seven to eight steps leading up to it from the street level. On the night in question, a porch light illuminated the porch area. There were also two street lamps near the house which provided general lighting: one on 57th Street and one on Pentridge Street, both of which were across the street from the house.[4]

5. It took the Officers no more than two minutes to respond to the radio call. When they arrived at the location, the patrol car's overhead lights and sirens were not activated. Officer DeJesus parked the patrol car in front of the house, approximately ten feet from the front of the porch steps. Once parked, Officer Mitchell observed a black male, later identified as Defendant, wearing a blue jacket, standing on the porch directly facing the front door, crouching over at the waist, slightly bent at the knee, leaning down toward the doorknob located on the left side of the door. Officer Mitchell also observed the

---

[1] United States v. Tyrone Fields, No. 10-81-1, Suppression Hr'g Tr., Nov. 15, 2010, ("Tr.") 4:13-5:8, 6:3-6, 15:8-9, 35:8-10 (testimony of Officer Stephen Mitchell); 48:13-49:5, 49:11-12 (testimony of Officer Eriberto DeJesus).

[2] Id. at 5:23-6:2, 6:7-11:25 (testimony of Officer Mitchell); 49:13-24 (testimony of Officer DeJesus); Gov't Ex. 2.

[3] Tr. at 5:16-22 (testimony of Officer Mitchell).

[4] Id. at 14:8-18, 15:16-19, 17:24-18:18, 28:19-25 (testimony of Officer Mitchell); Gov't Ex. 1.

reflection of a shiny unknown object in Defendant's left hand.[5]

6. Upon making these observations, Officers Mitchell and DeJesus exited the patrol unit. Officer DeJesus remained near the patrol vehicle; Officer Mitchell walked around the front of the vehicle and yelled "Yo" to get Defendant's attention. When Defendant turned to face the street, Officer Mitchell observed that the object in Defendant's left hand was metal. Based on previous experiences working in the burglary detail, Officer Mitchell suspected that Defendant was attempting to break into the house by jimmying the doorknob lock.[6]

7. Defendant was also holding a cell phone, which was initially in his right hand, but when he turned around toward Officer Mitchell, he placed the cell phone into his left hand, lifted it up to his ear, and transferred the metal object to his right hand.[7]

8. Officer Mitchell instructed Defendant to come off the porch, and Defendant began to descend the steps. The Officer slowly began walking up the steps to meet him midway, at which point he heard a female shouting behind the front door. As he got closer to the Defendant, the Officer observed that the metal object was a knife.[8]

9. Even though Defendant never threatened Officer Mitchell with the knife, the Officer still felt endangered since Defendant was holding a weapon.[9]

10. Officer Mitchell commanded that Defendant drop the knife, a command which Defendant disregarded. The Officer repeated the order, and Defendant began to partially slide the knife into his sleeve, as if to hide it from Officer Mitchell's view. Upon the second command, Defendant was within five feet of the Officer, close enough to inflict harm. When Defendant failed to comply, Officer Mitchell reached out, grabbed Defendant's wrist using a control hold to immobilize the knife hand, and disarmed him. The knife fell onto the steps. It was later retrieved by the Officers and identified as a silver-colored

---

[5] Tr. at 12:1-3, 12:23-13:19, 14:19-15:15, 18:20-19:7, 29:8-9, 36:8-13, 44:22-45:5 (testimony of Officer Mitchell); 51:18-19 (testimony of Officer DeJesus).

[6] Id. at 15:6-15, 19:3-19, 36:14-17 (testimony of Officer Mitchell); 52:1-5, 53:2-11 (testimony of Officer DeJesus).

[7] Id. at 19:20-20:7 (testimony of Officer Mitchell).

[8] Id. at 15:16-21, 20:8-12, 23:3-9, 45:3-46:1 (testimony of Officer Mitchell); 52:5-8 (testimony of Officer DeJesus)

[9] Id. at 38:18-22, 46:11-22 (testimony of Officer Mitchell).

metal butter knife, approximately seven inches in length.[10]

11. Officer Mitchell then took Defendant to the patrol car to separate him from the female behind the front door. The Officer believed the female to be the complainant because the police radio call stated that the complainant was within the house.[11]

12. Once Defendant was brought to the patrol car, for purposes of officer safety, his arms were placed on the car's hood, his legs were spread, and his outer clothing was patted-down for weapons. During this frisk, Officer Mitchell felt a bulge in Defendant's left pocket that felt like a gun. The Officer removed the object from Defendant's pocket. The object was in fact a gun, later identified to be a silver/black Taurus handgun, Model PT-138, .380 caliber, loaded with nine live rounds of ammunition in the cartridge and one in the chamber. Upon finding the firearm, Officer DeJesus confirmed with his partner that he had Defendant under control, and then walked up the porch steps to locate the female complainant.[12]

13. Officer DeJesus knocked on the front door of the house and announced to the occupant, later identified as Shakeema Mason ("Mason"), that it was the police. Mason opened the door and spoke to Officer DeJesus, indicating to him that she was the complainant.[13]

14. While Officer DeJesus was speaking to Mason, Officer Mitchell used the police radio to check whether Defendant had a license to carry the firearm; he did not. At that point, Defendant was placed under arrest for illegal possession of a firearm.[14]

15. After Defendant was placed under arrest, Officer Mitchell conducted a more thorough search. Retrieved from the Defendant was a clear bag which contained a dark tinted Ziplock bag and a container, both of which held a green leafy substance later identified as marijuana.[15]

---

[10] Id. at 15:22-16:13, 20:8-21:4, 21:8-22:19, 23:23-24:3, 37:21-40:7 (testimony of Officer Mitchell); 52:9-24, 54:4-14 (testimony of Officer DeJesus).

[11] Id. at 22:20-23:21 (testimony of Officer Mitchell).

[12] Id. at 16:13-23, 24:4-26:1, 30:6-13, 41:5-42:20 (testimony of Officer Mitchell); 53:14-20, 55:15-56:1 (testimony of Officer DeJesus).

[13] Id. at 43:14-20 (testimony of Officer Mitchell); 52:24-53:1, 54:15-55:6 (testimony of Officer DeJesus).

[14] Id. at 16:24-17:23, 26:2-6, 44:1-6 (testimony of Officer Mitchell).

[15] Id. at 26:7-28:18 (testimony of Officer Mitchell).

16. At approximately 7:42 a.m. on the same date, Detective Jean-Pierre Langan orally informed Defendant of his *Miranda* rights. Defendant then orally waived his rights and gave an incriminating statement to the Detective.[16]

**DISCUSSION**

Defendant Fields presents one argument in support of his motion to exclude the evidence obtained on March 22, 2009. He alleges that his Fourth Amendment rights were violated because there was no reasonable suspicion for the police officers to conduct a *Terry* stop and frisk. Consequently, the evidence seized, namely a firearm, which directly resulted from the illegal stop, must be suppressed under the fruit of the poisonous tree doctrine. Based on the same doctrine, Defendant also argues for the suppression of his subsequent incriminating statement. The Court must "evaluate a *Terry* stop and frisk as two independent actions, each requiring separate justifications. The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed."[17] The burden is on the Government to prove by a preponderance of the evidence that any warrantless search or seizure that occurred was lawful.[18]

**A.    The responding officers had reasonable suspicion justifying the stop of Defendant.**

The Fourth Amendment to the United States Constitution prohibits "unreasonable

---

[16] Defendant's sole argument to suppress the incriminating statement is based upon the fruit of the poisonous tree doctrine. See Def.'s Supplemental Mot.; Gov't Resp. 2-3; Tr. at 3:8-15, 95:6-13.

[17] United States v. Carstarphen, 298 F. App'x 151, 154 (3d Cir. 2008) (internal quotations and citations omitted).

[18] See United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988).

searches and seizures."[19] Pursuant to that prohibition, the warrant requirement acts as protection against Fourth Amendment violations by law enforcement. At issue here is the "*Terry* stop" exception to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[20] The level of suspicion required by *Terry* is less than the probable cause standard and need not be supported by a preponderance of evidence,[21] but the officer must have a " 'particularized and objective basis' for suspecting legal wrongdoing"[22] and it must be more than a mere "hunch."[23] A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it, which may include the reliability of a tip, the content of a tip, personal observations of suspicious behavior, specialized knowledge, expertise and training, as well as investigative inferences.[24] As such, "[t]he Supreme Court has [] recognized that [] reasonable suspicion may be the result of any combination of one or several factors."[25] "Not every factor is necessary . . . [and] there are no magic combinations that

---

[19] U.S. Const. amend. IV.

[20] Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

[21] Id.

[22] United States v. Arvizu, 534 U.S. 266, 273 (2002) (referencing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

[23] Terry v. Ohio, 392 U.S. 1, 27 (1968).

[24] United States v. Nelson, 284 F.3d 472, 477-79 (3d Cir. 2002); United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2002).

[25] Nelson, 284 F.3d at 478.

guarantee reasonable suspicion in every case."[26] The Court must examine the "whole picture" rather than finely parse out the factors on which reasonable suspicion may depend.[27] Hence, the reasonable suspicion inquiry is highly reliant upon the facts of a case.[28]

In this case, the parties agree that a stop or seizure occurred when Officer Mitchell used a control hold on Defendant to disarm him of the knife he was holding.[29] Because this initial stop is alleged to be a constitutional violation, the relevant facts known to the police officers preceding the stop acquire particular salience. The Court thus provides its *Terry* analysis by evaluating (1) the reliability of the tip; (2) the content of the tip; and (3) the personal observations of the Officers.

*Reliability of Tip*

Where, as here, the primary basis for a *Terry* stop is an informant's report or "tip," a Court must look to the "veracity," "reliability," and "basis of knowledge" of that individual.[30] The Third Circuit, reviewing multiple cases involving tips received in a variety of different circumstances, has established generally that the following indicate reliability:

(1) the tip information was relayed from the informant to the officer in a face-to-face

---

[26] United States v. Carstarphen, 298 F. App'x 151, 156 (3d Cir. 2008).

[27] United States v. Bouie, No. 01-507, 2002 WL 467314, at *5 (E.D. Pa. Mar. 26, 2002) (internal citations and quotations omitted).

[28] United States v. Goodrich, 450 F.3d 552, 553 (3d Cir. 2006).

[29] See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) ("A seizure occurs when there is (a) a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, or (b) submission to show of authority") (internal quotations and citations omitted); Terry v. Ohio, 392 U.S. 1, 19-20 n.16 (1968).

[30] Illinois v. Gates, 462 U.S. 213, 230 (1983) (internal quotations omitted).

> interaction such that the officer had an opportunity to appraise the witness's credibility through observation;
>
> (2) the person providing the tip can be held responsible if her allegations turn out to be fabricated;
>
> (3) the content of the tip could not have been generated by the general public, nor based solely on observation;
>
> (4) the informant has recently witnessed the alleged criminal activity; and
>
> (5) the tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.[31]

Here, though the Officers did not have an opportunity to appraise the informant's demeanor or credibility through face-to-face observation, the informant could be identified by name and location. Identified informants' tips are given more weight than tips from anonymous informants because the individuals reporting are subject to adverse consequences from false complaints. In this case, the informant was not anonymous since the police were called to the complainant's specific location. In addition, given the context of the call, a reasonable, trained officer would have reason to assume that the female within the house was the complainant who made the 911 call. In fact, when Officer Mitchell read the flash information, he believed this to be the case. Also, the informant was reporting the alleged criminal activity while contemporaneously experiencing or witnessing it, further supporting the reliability of the tip.

On the facts available, considering the totality of circumstances, the Court finds the Officers had reason to believe the tip was reliable, truthful and based in the knowledge of the reporting informant.

---

[31] Brown, 448 F.3d at 249-50 (internal citations and quotations omitted).

*Content of Tip*

Next, the Court focuses on the content of the report to determine whether it "provide[d] a particularized and objective basis for suspecting [] the particular person stopped of [] criminal activity."[32] The content of the flash information stated that it was a priority one call, reporting someone trying to break into an occupied home at 5663 Pentridge Street. It was further conveyed that the suspected criminal was a black male wearing a light blue Pelle Pelle jacket, kicking the front door of the residence. Even if Defendant were correct that the content of the flash, by itself, did not provide sufficient detail to justify reasonable suspicion,[33] the totality of circumstances, including the subsequent officer observations of Defendant at the door to 5663 Pentridge Street, no more than two minutes after the flash was issued, bolster the reliability of the caller and offer ample support to justify the initial stop.

*Personal Observations of Officers Mitchell and DeJesus*

The Third Circuit has outlined six relevant factors the Court must evaluate regarding the personal observations of the Officers: (1) The reputation of the area in which the stop occurred for criminal activity; (2) a suspect's presence on a street at a late hour; (3) the geographic and temporal proximity of the stop to the scene of the alleged crime; (4) the number of persons in the

---

[32] Goodrich, 450 F.3d at 560 (internal citations omitted).

[33] See, e.g., Brown, 448 F.3d at 247-48 (stating that police broadcast identifying the "suspects as African-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5'8" and the other was 6' " paints too broad a brush to satisfy the reasonable suspicion standard); United States v. Bouie, No. 01-507, 2002 WL 467314, at *5 (E.D. Pa. Mar. 26, 2002) (noting that a tip describing a "heavyset black male and a tall, thin black male in a blue car and a gray car with tinted windows" was insufficient in detail for purposes of reasonable suspicion).

area; (5) whether the suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity; and (6) a suspect's "nervous, evasive behavior," or flight from police.[34] Notably, many of these factors were present in this case.

Based upon the content of the flash information received after midnight, the Officers responded to the specified address in an area with a reputation for a high-level of crime. Even considering only these first two factors, there is support for an inference of criminal activity.[35] Regarding factor (3), the Officers arrived at the location quickly—within two minutes—and kept the patrol unit's lights and sirens off. Consequently, they observed the residence and the suspect prior to being noticed. Upon arrival, Officer Mitchell observed Defendant at the exact location where the breaking and entering was allegedly occurring. And although Defendant is correct that it is legal for him to be standing in front of a door on a porch at 12:40 a.m. holding a knife and talking on a cell phone, when considered with the totality of circumstances, it may amount to reasonable suspicion.[36] According to Officer Mitchell's credible testimony, upon the Officers' arrival, the Defendant was wearing a blue jacket standing on the porch of the residence, crouching over the doorknob with a shiny object in his left hand, the same side as the doorknob. That Defendant was not kicking the front door does not diminish the basis for suspicion created by the

---

[34] See Brown, 448 F.3d at 251; Goodrich, 450 F.3d at 561; see also United States v. Carstarphen, 298 F. App'x 151, 156 (3d Cir. 2008).

[35] Goodrich, 450 F.3d at 561 (citations omitted).

[36] See, e.g., United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002) (internal quotations and citations omitted); see also Johnson v. Campbell, 332 F.3d 199, 207 (3d Cir. 2003) ("The Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed.").

report since Defendant may have changed techniques in an attempt to break into the house. Based upon his observations of Defendant's stance in front of the door and his specialized knowledge from working the burglary detail, Officer Mitchell believed that Defendant was attempting to jimmy the lock with a shiny metal object.

The Officers then took reasonable steps to investigate the matter further. First, upon getting Defendant's attention by yelling "Yo," Officer Mitchell instructed Defendant to come down from the porch. As the Officer got closer, he heard a female voice shouting from behind the front door. Soon thereafter, the Officer noticed that the object in Defendant's hand was a knife, and commanded that Defendant drop the knife. Defendant then demonstrated nervous and evasive behavior by disregarding Officer Mitchell multiple times and attempting to hide the knife from his view. While still holding the weapon, Defendant came within striking distance of the Officer, and the Officer seized Defendant by applying a control hold on his knife hand to disarm him.

All of the above observations were consistent with the flash information, and, considering the foregoing factors *in toto*, the Court concludes that the initial stop in question was amply supported by reasonable suspicion, and therefore lawful.

**B.      Officer Mitchell had reasonable suspicion justifying the frisk of Defendant.**

We turn now to the legality of the frisk. In *Terry*, the Supreme Court has held that law enforcement, during the course of an investigatory stop, may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing

with an armed and dangerous individual. . . ."[37] This is an objective standard: the issue is whether, given the relevant facts, the particular officer "would be warranted in the belief that his safety or that of others was in danger."[38] Under Terry, an officer who makes an investigative stop may conduct a limited pat-down frisk of a suspect's outer clothing.[39]

Here, considering the flash describing the criminal activity as a residential break-in attempt, the late night hour, the reputation of the area as one of high-crime, the female behind the front door apparently disallowing Defendant from entering the household, Defendant's possession of a knife and refusal to drop it when so commanded by Officer Mitchell, and eventually coming within close range of the Officer, the Officer was surely warranted in believing that his safety, his partner's safety, and that of the female inside the house, were in danger. It was reasonable for the Officer to preserve the status quo by taking Defendant to the patrol vehicle away from the female and conducting a limited pat-down search for any additional weapons.

The Officer confined his search to what was minimally necessary to learn whether Defendant was armed, simply frisking his outer clothing. Once he felt a gun-like bulge in Defendant's pocket, the Officer was justified in reaching into Defendant's pocket to disarm him.

**CONCLUSIONS OF LAW**

1. Based on the totality of circumstances, the police officers' stop of Defendant was based on reasonable suspicion: the reliability of the 911 caller; the content of the radio call; the high priority of the call; the reputation of the geographic area for a

---

[37] Terry v. Ohio, 392 U.S. 1, 27 (1968); see also United States v. Hensley, 469 U.S. 221, 235 (1985).

[38] Terry, 392 at 27.

[39] Id. at 27-30.

high-level of crime; the late night hour; the short time period between dispatch and the Officers' arrival at the residence; the Defendant's presence at the exact location of the alleged crime in progress, and his appearance matching the flash description; personal observations by the Officers of Defendant's stance at the front door; Officer Mitchell's belief, based on specialized knowledge, that Defendant was jimmying the lock; Defendant holding a knife; Defendant's evasive conduct by disregarding Officer commands and attempting to hide the knife; and the presence of a female shouting from behind the front door of the residence provide ample objective facts to warrant an investigatory stop.

2. Relying on the information provided, Officers Mitchell and DeJesus's decision to stop the Defendant for investigatory purposes was supported by reasonable suspicion and did not violate the Fourth Amendment.

3. Furthermore, the frisk of Defendant's outer clothing was reasonable and justifiable due to the dangerous nature of the alleged crime, the conduct of the suspect, the need to ensure the personal safety of the officers and the potential victim, and the maintenance of the status quo during the course of the stop.

4. Because the initial *Terry* stop and frisk was legal, the fruit of the poisonous tree doctrine does not apply—the firearm and subsequent incriminating statement are properly admitted.

5. Additionally, Officer Mitchell legally placed Defendant under arrest after learning that he was carrying a firearm without a license. Thereafter, the Officer was justified in conducting a search incident to arrest, which revealed marijuana in Defendant's pocket. Due to the circumstances, the marijuana is also properly admitted.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence Obtained in Violation of the Fourth Amendment and the Supplemental Motion are DENIED. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| v. ) | **CRIMINAL ACTION** |
| ) | **NO. 10-00081** |
| ) | |
| **TYRONE FIELDS,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

**AND NOW**, this 14th day of December 2010, upon consideration of Defendant's Motion to Suppress Physical Evidence Obtained in Violation of the Fourth Amendment [Doc. No. 18] and the Supplemental Motion to Suppress [Doc. No. 21], seeking the suppression of physical evidence obtained on March 22, 2009 in connection with an investigative stop of Defendant at 5663 Pentridge Street, as well as a subsequent incriminating statement elicited from Defendant on the same day, the Government's Response [Doc. No. 20], after testimony presented at an evidentiary hearing and oral argument thereon, and in accordance with the Court's decision entered November 15, 2010 [Doc. No. 23], it is hereby

**ORDERED** that Defendant's Motion to Suppress Physical Evidence [Doc. No. 18] and Supplemental Motion to Suppress [Doc. No. 21] are **DENIED**.

It is so **ORDERED**.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**